UNITED STATES of America,
Plaintiff–Appellee,

v.

Samuel Scott RAYMER, Defendant–
Appellant.

No. 89–6362.

United States Court of Appeals,
Tenth Circuit.

July 24, 1991.

**1034**

Submitted on the briefs: *

Richard M. Wintory, Sp. Asst. U.S. Atty. and Timothy D. Leonard, U.S. Atty., Oklahoma City, Okl., for plaintiff-appellee.

Scott M. Anderson, Dallas, Tex., for defendant-appellant.

Before McKAY, ANDERSON and BALDOCK, Circuit Judges.

BALDOCK, Circuit Judge.

By superseding indictment, defendant-appellant Samuel Scott Raymer was indicted in eight of ten counts of an indictment charging, in pertinent part, seven defendants with various offenses arising out of the alleged distribution of the drug methylenedioxymethamphetamine or MDMA. Defendant also was charged with conspiracy to distribute cocaine. After a jury trial, defendant was convicted on seven counts: (1) counts four, five and seven, introducing a misbranded drug into interstate commerce with the intent to mislead or defraud, 21 U.S.C. §§ 331(a) & 333(a)(2),[1] on or about January 1986, April 1986 and April 1987, respectively; 2) count one, conspiracy to commit this offense from June 1985 to April 1987, 18 U.S.C. § 371; 3) count eight, distribution of MDMA, a Schedule I controlled substance analogue, 21 U.S.C. §§ 813, 841(a)(1), on or about April 11, 1987; 4) count two, conspiracy to commit this offense, 21 U.S.C. §§ 813, 841(a)(1), 846, from October 24, 1986 to April 1987; and 5) count three, conspiracy to possess with intent to distribute and distribution of cocaine, a Schedule II controlled substance, 21 U.S.C. §§ 841(a)(1), 846, from June 1985 to April 11, 1987.

These offenses predated the Sentencing Guidelines, which apply only to offenses committed after November 1, 1987. *See United States v. Williams,* 897 F.2d 1034, 1040 (10th Cir.1990). Defendant therefore was sentenced in accordance with pre-Guidelines law. On the MDMA misbranding convictions (counts one, four, five and seven) defendant was sentenced to a term of two years. On the convictions for conspiracy to distribute MDMA and distribution of MDMA, a controlled substance analogue, (counts two and eight), and the conviction for conspiracy to possess with intent to distribute cocaine and distribution of cocaine (count three), defendant was sentenced to five years. The sentences on all counts ran concurrently. Additionally, on count three, defendant received a six-year supervised release term with mandatory participation in a drug aftercare program.

MDMA became subject to federal controlled substance penalties as a controlled substance analogue on October 27, 1986. *See United States v. Mitcheltree,* 940 F.2d 1329, 1335–1336 (10th Cir.1991). Before and after October 27, 1986, defendant supervised a large MDMA distribution network in Texas and Oklahoma. Defendant initially traveled via commercial airline from Texas, where he resided, to Oklahoma and concealed the MDMA tablets on his person or in his personal belongings. Rec. supp. vol. III at 99. When in Oklahoma City, he then consigned or sold large quantities of MDMA tablets to other drug dealers including Lance Miller. Miller testified that he purchased 100 to 250 MDMA tablets per week for resale and estimated that defendant distributed as many as 2,000 MDMA tablets per week. *Id.* at 94–95.

In October 1985, defendant was arrested in an undercover buy operation at Dallas Love Field, en route to Oklahoma City. *Id.* supp. vol. IV at 232, 244. The Dallas police obtained search warrants and found 2,450 unlabeled MDMA tablets in an airport locker and in defendant's carry-on luggage.

---

* Through inadvertence, defendant's counsel failed to appear for oral argument on November 7, 1990. After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed.R.App.P. 34(a); 10th Cir.R. 34.1.9. The cause therefore is ordered submitted without oral argument.

1. 21 U.S.C. § 333(a)(2) was formerly designated § 333(b). Although the parties have cited the former designation, we cite the current one.

*Id.* at 232. Defendant pled guilty in Texas state court and received a sentence of ten years probation for his delivery of MDMA. Rec. supp. vol. XII, doc. 22 at 2 (citing *Texas v. Raymer*, Nos. F–85–92267–S & F–85–91340–NS (Dallas County, Tx.D.Ct. (282nd Jud.Dist.) Sept. 2, 1986)).

Defendant also possessed and distributed cocaine. Danny Gile testified that between August 1985 and March 1986, he saw defendant with over an ounce of cocaine. Rec. supp. vol. V at 707. Defendant offered to sell Gile cocaine. *Id.* at 696. Gile tried some, but did not purchase any because he had another supplier. *Id.* at 696–97. Gile also saw the defendant with a briefcase containing cash and a revolver. *Id.* at 691. In October 1985, defendant hosted a football party at his Texas home and provided MDMA and cocaine for his guests. *Id.* supp. vol. IV at 161–62; supp. vol. III at 637.

After his first arrest in October 1985, defendant was apprehensive about using the commercial airlines in connection with his MDMA distribution. He therefore obtained a new vehicle and began driving from Dallas to Oklahoma City because it entailed less chance of being caught with the contraband. *Id.* supp. vol. V at 450. While in Oklahoma City, he stayed with Kevin Volk and JoAnn Mitcheltree and distributed MDMA to various dealers. *Id.* By January 1986, defendant, Volk and Mitcheltree were packaging MDMA for resale. *Id.* at 456.

In February 1986, defendant consigned six grams of cocaine to Volk with the understanding that Volk could keep any proceeds in excess of $80 per gram. *Id.* at 482. Volk sold five grams and used one. *Id.* at 482–83. This arrangement continued at least twice a month until the end of 1986 or early 1987, with Volk in Oklahoma City and defendant in Texas. *Id.* at 483. Also in February 1986, defendant offered to supply former-associate-turned-informant Leslie Lynn Ricks with cocaine. Rec. supp. vol. VII at 751. Ricks was provided with a sample to examine visually, but he declined to purchase any because he was satisfied with his existing supplier. *Id.* Thereafter, defendant twice offered to sell Ricks a remaining "eightball" (one-eighth ounce) of cocaine. *Id.* at 751.

In June 1986, Plano, Texas police executed a search warrant at defendant's residence and arrested him. The search revealed typical drug dealer items—numerous pills in various unmarked bottles, small plastic bags containing white powder, several rolls of plastic bags, a cocaine grinder, a triple section scale, a gold plated straw, $6,000 in currency, numerous firearms, seven bags of bullets and a not-so-typical picture of defendant posing with a straw over a pound of cocaine on a plate glass mirror. *Id.* supp. vol. IV at 276–77, 282–84, 314–15, 337–38, 354. Inside defendant's garage was a motorcycle with the license plate XTEXY (ecstasy). *Id.* at 307. The drugs found during the search contained the presence of cocaine (2.23 grams) and MDMA (63.69 grams). *Id.* at 364–66, 368. Defendant was charged in two Texas state criminal cases with possession of cocaine and MDMA, and ultimately received ten years probation to run concurrently with his previous Dallas County sentence. *Id.* supp. vol. XII, doc. 22 at 2–3 (citing *Texas v. Raymer*, Nos. F–86–442–S & F–86–443–S (Collin County, Tx.D.Ct. (219th Jud.Dist.) Feb. 2, 1987)).

Defendant agreed to cooperate with the Plano authorities for more lenient treatment. Rec. supp. vol. III at 78. Mitcheltree and Volk had to quit the MDMA business because defendant was no longer making trips to Oklahoma City. *Id.* supp. vol. IV at 469. According to Volk, a few months later defendant contacted Mitcheltree offering to send MDMA through the mail. Volk talked with defendant about which type of mail service was preferable. Defendant explained that express mail was preferable because "the law states you need a court order to get into the U.S. mail," *id.* at 470, and a private parcel service "can open it," *id.* at 471. For two or three weeks, MDMA tablets were sent to Mitcheltree and Volk through the mail. *Id.*

During September–October 1986, defendant relied upon road trips and the mail for delivery of MDMA to other dealers. Cov-

ert distribution of MDMA or payment of cash frequently occurred in public places. For example, defendant confessed to the FBI that he used pagers to make arrangements with his MDMA suppliers. Later, he would retrieve the drugs which had been left for him from a designated place such a men's restroom at McDonalds or Burger King. Rec. supp. vol. III at 80.

Defendant was arrested a third time in July 1987, for arranging the April 1987 sale of 401 MDMA tablets to Ricks, with delivery at the Will Rogers Airport in Oklahoma City. *See id.* supp. vol. VI at 767–769; supp. vol. VIII 1249–51. Defendant's brother, Ryan Shane Raymer, made the actual delivery. Both were charged in an Oklahoma state felony information with conspiracy to distribute, possession with intent to distribute and distribution of MDMA. *Id.* supp. vol. XII, doc. 22 at 3 (citing *Oklahoma v. Raymer,* No. RF87–03966 (Okla. County D.Ct.Jul. 20, 1987)); Appellant's Brief at 1. Defendant waived extradition and was detained in Oklahoma for seven months, from December 22, 1987, until July 22, 1988, when he made bond. *Id.*

In November 1988, the Oklahoma state case against defendant and his brother was set for trial, but defendant did not appear due to his surrender on Texas misdemeanor charges as well as revocation of suspended sentence proceedings in Texas. Rec. supp. vol. XII, doc. 167 (R. Wintory affidavit, ¶ 4 at 2). The Texas misdemeanor charges were dismissed. *Id.* Defendant did not appear at subsequent trial settings of the Oklahoma state case. *Id.* Although defendant had waived extradition from Texas to Oklahoma in 1987, he indicated that he would not voluntarily return to Oklahoma.

Oklahoma sought to extradite defendant; however, the proceedings "encountered significant procedural difficulties including the disappearance of the Governor's Warrant." *Id.* The prosecutor in the state case was Richard Wintory, who later was designated a special assistant United States Attorney. In his federal capacity, Mr. Wintory was instrumental in obtaining a federal indictment against the defendant

and subsequently arranging for the dismissal of the Oklahoma state case in lieu of federal prosecution.

On appeal, defendant contends that the district court erred in not dismissing the superseding indictment (1) on double jeopardy grounds as a sham prosecution or (2) on due process grounds as a vindictive prosecution. He also contends that (3) his conviction on the three conspiracy counts (counts one, two and three) violates double jeopardy because the three conspiracies are but one; (4) the evidence is insufficient to prove a conspiracy to distribute cocaine (count 3); (5) the evidence is insufficient to prove conspiracy to introduce and introducing misbranded MDMA into interstate commerce with intent to mislead or defraud a government agency, including local police departments; and (6) classification of MDMA as a controlled substance analogue violates the *ex post facto* clause. We affirm in part and reverse in part.

### I. Double Jeopardy–Successive Prosecution

■ Relying on statements in *Bartkus v. Illinois,* 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959), defendant argues that the federal prosecution in this case was merely a tool of the state authorities, a "sham and a cover" for an otherwise impermissible State of Oklahoma prosecution. *See id.* at 123–24, 79 S.Ct. at 678. He claims that Mr. Wintory, in his capacity as state prosecutor, controlled and manipulated the federal process, Appellant's Brief at 11, as evidenced by an absence of significant federal involvement in investigation and prosecution. Further, by the State conducting proceedings on the state felony information, and then dismissing those proceedings in favor of federal prosecution, defendant claims that he has been deprived of the right to a speedy trial on constitutional and statutory grounds. *See Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); 18 U.S.C. § 3161–3174 (Speedy Trial Act). He also alleges that his right to a fair trial has been compromised in the absence of a speedy trial. The district court rejected the notion that the federal proceeding was a sham prosecution

and denied the defendant's motion to dismiss. Rec. supp. vol. III at 41.

■ We review a district court's legal conclusion on a double jeopardy claim *de novo. United States v. Cardall,* 885 F.2d 656, 665 (10th Cir.1989). Subsidiary factual findings are reviewed under the clearly erroneous standard. *United States v. Jones,* 816 F.2d 1483, 1486 (10th Cir.1987) (whether conspiracies were separate and distinct under prior law was factual; district court finding reviewed under the clearly erroneous standard); *United States v. Martinez,* 562 F.2d 633, 638 (10th Cir. 1977) (same). The burden is on the defendant to prove a double jeopardy claim. *United States v. Felix,* 926 F.2d 1522, 1531 (10th Cir.1991); *Jones,* 816 F.2d at 1486. When a defendant claims that federal and state officials are not acting as dual sovereigns, he has a substantial burden of proving one sovereign is so dominated by the actions of the other that the former is not acting of its own volition. *United States v. Liddy,* 542 F.2d 76, 79 (D.C.Cir.1976).

■ The double jeopardy clause of the fifth amendment "bars any subsequent prosecution in which the government, to establish an essential element of an offense charged in that prosecution, will prove conduct that constitutes an offense for which the defendant already has been prosecuted." *Grady v. Corbin,* — U.S. —, 110 S.Ct. 2084, 2093, 109 L.Ed.2d 548 (1990) (footnote omitted); *See also Harris v. Oklahoma,* 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977). Double jeopardy scrutiny is appropriate when there are "successive prosecutions arising from virtually the same conduct involving the same actors and overlapping time frames." *Felix,* 926 F.2d at 1531. It is well established, however, that a subsequent federal prosecution based upon the same conduct as a terminated state prosecution does not violate the double jeopardy clause of the fifth

amendment. *Abbate v. United States,* 359 U.S. 187, 195, 79 S.Ct. 666, 670, 3 L.Ed.2d 729 (1959); *United States v. Lanza,* 260 U.S. 377, 382, 43 S.Ct. 141, 142, 67 L.Ed. 314 (1922). The dual sovereignty doctrine rests upon the notion that laws of separate sovereigns are indeed separate and that one act may violate the laws of each; accordingly, prosecution by each cannot be for the *same* offense and double jeopardy concerns are not implicated. *Heath v. Alabama,* 474 U.S. 82, 88, 106 S.Ct. 433, 437, 88 L.Ed.2d 387 (1985). A possible exception to the dual sovereignty rule might exist where a federal or state prosecution was merely a tool manipulated by the other sovereign to revive a prosecution barred on federal constitutional grounds. *See Bartkus,* 359 U.S. at 123–24, 79 S.Ct. at 678–79; *United States v. Bernhardt,* 831 F.2d 181 (9th Cir.1981) (district court determined that jeopardy had attached in state prosecution). Accordingly, courts have considered double jeopardy claims that (1) federal prosecutors have manipulated state processes rendering the state prosecution a sham and a cover for an otherwise barred federal prosecution, *see, e.g., United States v. Moore,* 822 F.2d 35, 37–38 (8th Cir.1987); *United States v. Patterson,* 809 F.2d 244, 247 (5th Cir.1987); *United States v. Russotti,* 717 F.2d 27, 30–32 (2d Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1273, 79 L.Ed.2d 678 (1984); *United States v. Aleman,* 609 F.2d 298, 309 (7th Cir.1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *Liddy,* 542 F.2d at 79, and (2) state prosecutors have manipulated federal processes rendering the federal prosecution a sham and a cover for an otherwise barred state prosecution, *see, e.g., Bernhardt,* 831 F.2d at 182.

We consistently have recognized the dual sovereignty rule in holding that a defendant is not entitled to dismissal of an indictment even if the government does not comply with its *Petite* [2] policy. *See United*

---

**2.** *See Petite v. United States,* 361 U.S. 529, 530, 80 S.Ct. 450, 451, 4 L.Ed.2d 490 (1960). The *Petite* policy provides that after a state trial a subsequent federal trial for the same conduct should not occur absent compelling reasons and prior approval by the Justice Department. *See United States v. Valenzuela,* 584 F.2d 374, 376 (10th Cir.1978).

Defendant requested that the Justice Department review its dual and successive prosecution policies in light of the initial indictment. Rec. supp. vol. XVI, doc. 177, supp. ex. at 1. The (footnote 2 continued on p. 1038)

*States v. Gourley,* 835 F.2d 249, 250–51 (10th Cir.1987), *cert. denied,* 486 U.S. 1010, 108 S.Ct. 1741, 100 L.Ed.2d 204 (1988); *United States v. Padilla,* 589 F.2d 481, 484 (10th Cir.1978); *United States v. Fritz,* 580 F.2d 370, 375 (10th Cir.) (en banc), *cert. denied,* 439 U.S. 947, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978); *United States v. Thompson,* 579 F.2d 1184, 1187 (10th Cir.) (en banc), *cert. denied,* 439 U.S. 896, 99 S.Ct. 257, 58 L.Ed.2d 243 (1978). *Padilla* is of particular significance because it involves the same prosecutor at the federal and state levels. Judge Logan's concurring opinion described the facts as follows:

The defendant here was charged in state court on six counts of trafficking in heroin. He ultimately pleaded guilty in all counts. A lawyer in the state prosecutor's office, apparently involved in the case in state court, became an Assistant United States Attorney and brought before a Federal grand jury the same transactions, securing indictments for the same acts previously charged in state court. The sole witness at the federal trial was a member of the Albuquerque, New Mexico Police Department who was involved in the gathering of evidence in the state case.

*Padilla,* 589 F.2d at 485 (Logan, J., concurring). Defendant challenged his conviction on double jeopardy grounds and the court held that the federal conviction was not barred. *Id.* at 484. The double jeopardy circumstances in *Padilla* were far more compelling than those in this case, yet the dual sovereignty doctrine controlled the case. *See id.* at 485 (Logan, J., concurring) ("It is hard to imagine another situation where the law permits what appears on its face to be such an apparent injustice, making a defendant answer twice for the same acts.").

██ Defendant's double jeopardy claim fails for any number of independent reasons. First, jeopardy never attached in the

Oklahoma state prosecution. In a jury trial, jeopardy attaches when the jury is impaneled and sworn; in a bench trial, jeopardy attaches when the first witness is sworn. *Crist v. Bretz,* 437 U.S. 28, 37–38, 98 S.Ct. 2156, 2161–2162, 57 L.Ed.2d 24 (1978); *Serfass v. United States,* 420 U.S. 377, 388, 95 S.Ct. 1055, 1062, 43 L.Ed.2d 265 (1975). Prior to any trial, the Oklahoma prosecution was dismissed in lieu of federal prosecution. *See Liddy,* 542 F.2d at 80 (state prosecution dismissed in lieu of federal prosecution). Second, although defendant claims that his constitutional and statutory right to a speedy trial has been circumvented, he offers no fact-law integration to support the claim. Sometimes things are what they appear; the lack of factual development and legal analysis on this claim strongly suggests its lack of merit. Moreover, defendant has never explained how the Oklahoma state prosecution would be barred as a result of the difficulty in extraditing him from Texas to Oklahoma. A lone cite to Tex.Crim.Pro. Ann. art. 51.13 (Vernon 1979 & 1991 Cum. Supp.) does not provide sufficient specificity, particularly in view of the many sections pertaining to extradition. We will not presume that insurmountable obstacles barred defendant's extradition. Third, defendant has not shown that the district court's factual findings are clearly erroneous.

The district court found that the state charges encompassed only a small part of defendant's alleged criminal activities. Rec. supp. vol. III at 42–43. The court also found that the federal superseding indictment involved criminal activity of a larger scope. *Id.* This is apparent from the federal indictment which charged a conspiracy to distribute MDMA and cocaine over approximately two years. Merely because some of the overt acts contained in the conspiracy counts of the federal indictment encompass defendant's prior Texas convic-

Justice Department indicated that its dual prosecution policy did not apply because jeopardy had not attached in the Oklahoma state criminal prosecution. *Id.* at 2. The Department also indicated that its successive prosecution policy was implicated by defendant's federal indict-

ment, given the prior Texas state prosecutions involving MDMA and cocaine. *Id.* at 1. According to the Department, however, the federal indictment was broader in scope and reflected a substantial federal interest not vindicated by the Texas prosecutions. *Id.* at 1.

tions or Oklahoma charges does not violate double jeopardy. *See Aleman,* 609 F.2d at 309.

Defendant concentrates on the degree of federal involvement in this case, arguing that it was insufficient. He points to the many witnesses who were involved in the previous state cases and Mr. Wintory's heavy involvement in both cases. As an initial matter, we question whether these factors alone could ever establish a sham prosecution given our holding in *Padilla* which involved the same state prosecutor and the same state evidence at the federal level. Assuming, *arguendo,* that the extent of independent federal involvement must be evaluated, *see Bernhardt,*[3] 831 F.2d at 183, the district court's finding on this score is not clearly erroneous. The district court found that the federal prosecution "involved substantial investigation separate and apart from the state charges," and that the federal designation of Mr. Wintory was appropriate to vindicate the substantial federal interest implicated by the scope of the alleged criminal activity. *See* Rec. supp. vol. III at 43. The federal government paid for the cost of prosecution, lawyers from the Justice Department and the local U.S. Attorney's office worked on the case, and a few witnesses were unique to the federal prosecution.

Defendant's double jeopardy claim under *Bartkus* fails as a matter of law. Moreover, defendant did not meet his substantial burden of proving that the federal prosecution was merely a tool of the State. For these reasons, the district court proper-ly declined to dismiss the indictment on double jeopardy grounds.

## II. Vindictive Prosecution

Defendant next claims that the original and superseding indictments in this case were products of prosecutorial vindictiveness. He suggests the following factors establish not only a realistic likelihood of vindictiveness, but also actual, personal malice: (1) the federal prosecution was undertaken after defendant asserted rights incident to extradition, (2) a superseding indictment adding substantive counts was returned after defendant obtained pretrial release, contrary to the government's wishes, (3) the federal government lacked substantial involvement in the investigation and prosecution of this case, and (4) the state and federal investigations and prosecutions were influenced by the discretion of a single state prosecutor, Mr. Wintory.

### A.

■ Vindictive prosecution claims often turn on the facts, and we review a district court's factual findings under the clearly erroneous standard; our review of the legal principles which guide the district court is de novo.[4] *United States v. Schoolcraft,* 879 F.2d 64, 67 (3rd Cir.1989). Any remedy for prosecutorial vindictiveness selected by the district court is reviewed for an abuse of discretion. *United States v. Meyer,* 810 F.2d 1242, 1245–46, *vacated,* 816 F.2d 695, *reinstated,* 824 F.2d 1240 (D.C.Cir.1987), *cert. denied,* 485 U.S. 940, 108 S.Ct. 1121, 99 L.Ed.2d 281 (1988); *United States v.*

---

**3.** In *Bernhardt,* the court determined that a federal prosecution is not a sham or cover for barred state prosecution when "sufficient independent federal involvement" exists. 831 F.2d at 183.

**4.** The First and Ninth Circuits view vindictive prosecution claims as mixed questions of fact and law; the district court's resolution of these claims is reviewed under the clearly erroneous standard. *United States v. Meyer,* 810 F.2d 1242, 1244 (D.C.Cir.), *vacated,* 816 F.2d 695, *reinstated,* 824 F.2d 1240 (D.C.Cir.1987), *cert. denied,* 485 U.S. 940, 108 S.Ct. 1121, 99 L.Ed.2d 281 (1988); *United States v. Spiesz,* 689 F.2d 1326, 1329 (9th Cir.1982). *See also United States v. Sammons,* 918 F.2d 592, 601 (6th Cir.1990) (fol-lowing *Meyer;* clearly erroneous standard governs). In this circuit, the standard of review for mixed questions of fact and law depends upon whether factual or legal inquiry predominates. "Where the mixed question involves primarily a factual inquiry, the clearly erroneous standard is appropriate. If, however, the mixed question primarily involves the consideration of legal principles, the *de novo* review by the appellate court is appropriate." *Supre v. Ricketts,* 792 F.2d 958, 961 (10th Cir.1986). Provided the district court has been guided by the correct legal principles, we agree that a vindictive prosecution claim viewed as a mixed question of fact and law should be reviewed under the clearly erroneous standard.

*Gallegos–Curiel*, 681 F.2d 1164, 1171 (9th Cir.1982). A defendant has the burden of proof and must establish either (1) actual vindictiveness, or (2) a realistic likelihood of vindictiveness which will give rise to a presumption of vindictiveness. *See United States v. Goodwin*, 457 U.S. 368, 374, 376, 380–81, 384 & n. 19, 102 S.Ct. 2485, 2489, 2490, 2492–93, 2494 & n. 19, 73 L.Ed.2d 74; *North Carolina v. Pearce*, 395 U.S. 711, 725, 89 S.Ct. 2072, 2080, 23 L.Ed.2d 656 (1969); *United States v. Doran*, 882 F.2d 1511, 1519, 1521 (10th Cir.1989) (citing *Meyer*, 810 F.2d at 1245–46); *United States v. Heldt*, 745 F.2d 1275, 1280 (9th Cir.1984). Thereafter, the burden shifts to the prosecution to justify its decision with legitimate, articulable, objective reasons. *Goodwin*, 457 U.S. at 374, 102 S.Ct. at 2489; *Pearce*, 395 U.S. at 726, 89 S.Ct. at 2081; *Doran*, 882 F.2d at 1518; *Meyer*, 810 F.2d at 1248; *Heldt*, 745 F.2d at 1280. If the defendant does not meet his burden of proof, however, the district court need not reach the government justification issue. *See Doran*, 882 F.2d at 1523; *Heldt*, 745 F.2d at 1280.

When a defendant exercises constitutional or statutory rights in the course of criminal proceedings, the government may not punish him for such exercise without violating due process guaranteed by the federal Constitution. *Goodwin*, 457 U.S. at 372, 102 S.Ct. at 2488; *Bordenkircher v. Hayes*, 434 U.S. 357, 363, 98 S.Ct. 663, 667, 54 L.Ed.2d 604 (1978); *United States v. Mills*, 925 F.2d 455, 463 (D.C.Cir.1991); *Doran*, 882 F.2d at 1518; *Meyer*, 810 F.2d at 1245. Thus, if a defendant successfully challenges a conviction, a more severe sentence may not be imposed after retrial in the absence of articulated reasons based upon objective information. *Pearce*, 395 U.S. at 726, 89 S.Ct. at 2081. Likewise, a prosecutor may not "up the ante" by filing felony charges when a convicted misdemeanant exercises his statutory appellate right to trial *de novo*. *Blackledge v. Perry*, 417 U.S. 21, 27–29, 94 S.Ct. 2098, 2102–2103, 40 L.Ed.2d 628 (1974).

In two pretrial situations, the Supreme Court has rejected a presumption of vindictiveness. Consequently, the presumption is without application when a prosecutor offers a defendant a chance to plead guilty or face more serious charges, provided the prosecutor has probable cause on the more serious charges and the defendant is free to accept or reject the offer. *Bordenkircher*, 434 U.S. at 363–64, 98 S.Ct. at 667–68. Likewise, the presumption does not apply when a defendant declines to plead guilty to misdemeanor charges in order to exercise his right to a jury trial, and a different prosecutor obtains a felony indictment. *Goodwin*, 457 U.S. at 382–84, 102 S.Ct. at 2493–94.

The Supreme Court has yet to apply the presumption of vindictiveness to a pretrial setting. Following *Meyer*, we have rejected the idea that a presumption of vindictiveness may never arise in the pretrial setting. *Doran*, 882 F.2d at 1520–21. Rather, in those pretrial situations which are genuinely distinguishable from *Goodwin* and *Bordenkircher*, we look at the totality of the objective circumstances to decide whether a realistic possibility of vindictive prosecution exists. *Doran*, 882 F.2d at 1521 (applying totality of the circumstances approach to post-mistrial setting) & n. 4 (discussing factors which distinguished *Meyer* from *Goodwin*). But see *Meyer*, 824 F.2d at 1251 (dissent from denial of rehearing en banc arguing that *Meyer* panel distinguished *Goodwin* on "utterly irrelevant" facts). Here, the district court determined that a presumption of vindictiveness was not warranted, yet it held an evidentiary hearing, given the "serious allegations raised" by defendant. Rec. supp. vol. III at 42. The district court found that (1) the federal prosecution was not an end-run around the procedural extradition problems encountered in the state prosecution, (2) the superseding indictment was not obtained in retaliation for the defendant obtaining bond, (3) a substantial federal interest was present in the prosecution and was not vindicated by the narrower state prosecution, (4) the cross-designation of Mr. Wintory was appropriate because of his familiarity with the alleged

conspiracies and the defendants, and (5) subsequent to the State's extradition difficulties, new investigative leads were developed that identified cooperating witnesses and other evidence.

Given a variety of fact patterns, federal courts repeatedly have rejected the idea that federal prosecution, after state proceedings, constitutes vindictive federal prosecution. *See, e.g., Schoolcraft,* 879 F.2d at 68 (prosecution by a different sovereign tends to negate a vindictive prosecution claim); *United States v. Fulford,* 825 F.2d 3, 9 (3rd Cir.1987); *United States v. Oliver,* 787 F.2d 124, 127 (3rd Cir.1986); *United States v. Ballester,* 763 F.2d 368, 369–70 (9th Cir.), *cert. denied,* 474 U.S. 842, 106 S.Ct. 126, 88 L.Ed.2d 103 (1985); *Russotti,* 717 F.2d at 31–32; *United States v. Ng,* 699 F.2d 63, 68–70 (2d Cir.1983); *United States v. DeMichael,* 692 F.2d 1059, 1062 (7th Cir.), *cert. denied,* 461 U.S. 907, 103 S.Ct. 1878, 76 L.Ed.2d 809 (1982); *United States v. Robison,* 644 F.2d 1270, 1272–73 (9th Cir.1981); *United States v. Burt,* 619 F.2d 831, 836–38 (9th Cir.1980). Separate sovereigns certainly may prosecute based on similar or identical facts, but here the federal and state lead prosecutors are one in the same person. *See Fulford,* 825 F.2d at 9 (court denied prosecutorial vindictiveness claim, court noted that federal prosecutor did not assist in state investigation or prosecution). In rejecting prosecutorial vindictiveness claims, however, courts have alluded to the idea that increased charges resulting from the exercise of a pretrial procedural right might constitute vindictiveness. *See Ballester,* 763 F.2d at 370 (defendants would be required to show that additional federal charges were added because of their attempt to dismiss state indictment; *held,* no presumption because independent judgment of dual sovereigns involved); *Heldt,* 745 F.2d at 1281 (vindictive prosecution claim might be successful where an increase in charges was in response to a motion to suppress); *Robison,* 644 F.2d at 1272 (defendant would have to demonstrate a connection between exercise of rights in prior state prosecutions and federal prosecution).

### B.

■ Turning first to actual vindictiveness, defendant has only one incident on which to base a colorable claim. During defendant's preliminary hearing in the Northern District of Texas, the prosecutor, Mr. Wintory, was asked why he delayed in bringing this case before a federal grand jury. One of the reasons given was because of the extradition difficulties the State of Oklahoma was encountering in regaining custody of the defendant from the State of Texas. *See* Rec. supp. vol. XVI, doc. 136 at 1, 4–6. During that hearing, Mr. Wintory testified concerning the defendant's reliance on "jurisdictional ploys" and "ploys and maneuvers" to avoid extradition and prosecution in the State of Oklahoma. *Id.* at 4–5.

It would be naive to think that the federal prosecution was not motivated in some part by the extradition difficulties. The question is whether the federal prosecution was "a direct and unjustifiable penalty for the exercise of a procedural right" by the defendant. *See Goodwin,* 457 U.S. at 384, 102 S.Ct. at 2494. The district court rejected this interpretation, instead finding that the federal prosecution was larger in scope and the product of new investigative leads concerning the defendant's criminal activity. *See* rec. supp. vol. III at 42–44. Although the motives for the federal prosecution appear mixed, the district court's finding concerning a lack of actual vindictiveness is not clearly erroneous for several reasons. First, the prosecutor's comments must be taken in context. These comments occurred during a preliminary hearing in which the government argued that the defendant was a flight risk based upon his failure to appear in Oklahoma after being released on bond and promising to return. The prosecutor contended that the lack of meritorious defenses to the federal charges made the risk of flight greater because defendant's exposure to federal and state (Texas) incarceration. Reasoning that defendant's extradition defense had gone by the wayside, the prosecutor unsuccessfully sought pretrial detention. Second, a per-

missible risk associated with defendant's insistence on formal extradition was that additional evidence would be uncovered concerning his criminal activity and the charges would be broadened. A claim of vindictive prosecution cannot insulate the defendant from the lawful consequences of his tactical choices. Having delayed the state prosecution for several months, defendant could not be guaranteed that the prosecution would stand still.

### C.

Rejecting defendant's claim of actual vindictiveness, we next must consider whether defendant was entitled to a presumption of vindictiveness. "There is no vindictiveness as long as the prosecutor's decision is based upon the normal factors ordinarily considered in determining what course to pursue, rather than upon genuine animus against the defendant for an improper reason or in retaliation for exercise of legal or constitutional rights." *DeMichael*, 692 F.2d at 1062. *Accord Schoolcraft*, 879 F.2d 64, 67; *Fulford*, 825 F.2d at 9; *Oliver*, 787 F.2d at 126. In the absence of procedural unfairness to the defendant, the government may increase charges or make them more precise based upon new information or further evaluation of the case. *Gallegos–Curiel*, 681 F.2d at 1169. Our inquiry must be whether, "as a practical matter, there is a realistic or reasonable likelihood of prosecutorial conduct that would not have occurred but for hostility or punitive animus towards the defendant because he exercised his specific legal right." *Id.*

At first blush, the prosecutor's obtaining a more serious federal indictment when the defendant asserted a right concerning extradition may appear to warrant an inference of vindictiveness. However, for two independent reasons, we believe that a presumptive inference is foreclosed completely by the Supreme Court's decisions in *Goodwin* and *Bordenkircher*. First and foremost, a prosecutor's response to a defendant's decision to resist extradition is in the nature of those prosecutorial responses which do not warrant a presumption of vindictiveness. *Goodwin*, 457 U.S. at 381, 102 S.Ct. at 2492. Extradition is a procedural right, routinely invoked, which will place some burden on the prosecution, but "it is unrealistic to assume that a prosecutor's probable response . . . is to punish and deter." *Id.* at 381, 102 S.Ct. at 2493.

The second reason why a presumption of vindictiveness is not warranted by the extradition decision here is that the prosecutor's strategy was a product of failed plea negotiations which culminated in the defendant's insistence on formal extradition, notwithstanding his earlier promise to return to Oklahoma. The Court has cautioned that "changes in the charging decision that occur in the context of plea negotiation are an inaccurate measure of improper prosecutorial 'vindictiveness.'" *Goodwin*, 457 U.S. at 379–80, 102 S.Ct. at 2492; *Bordenkircher*, 434 U.S. at 363–65, 98 S.Ct. at 667–69. Just as "a prosecutor may file additional charges if an initial expectation that a defendant would plead guilty to lesser charges proves unfounded, *Goodwin*, 457 U.S. at 380, 102 S.Ct. at 2492, so too may a state prosecutor refer a prosecution to federal authorities when plea negotiations fail. Without creating a presumption of vindictiveness, a state prosecutor may notify a defendant that his case will be referred to the federal government in the event that the state prosecution cannot proceed to trial. *Ballester*, 763 F.2d at 369–70. Likewise, a prosecutor may notify a defendant who declines to plead guilty that his case will be transferred to a forum in which stricter penalties are available. *Mills*, 925 F.2d at 463.

A presumptive inference of vindictiveness is not warranted as a matter of law by the sequence of events preceding the superseding indictment. First, the federal indictment and superseding indictment occurred before any state or federal trial; "[a]t this stage of the proceedings, the prosecutor's assessment of the proper extent of prosecution may not have crystallized." *See Goodwin*, 457 U.S. at 381, 102 S.Ct. at 2492–93. This lack of crystallization may be attributable to the prosecutor's discovery of additional information or a

better understanding of the broader significance of existing information. *Id.* Second, it is not reasonably likely that the government, having failed in its opposition to defendant's pretrial release, acted vindictively in obtaining a superseding indictment. The government takes a position on pretrial release in almost every criminal prosecution. Even if the government does not prevail, it is not reasonably likely that future prosecutorial decisions are punitive; if the government is dissatisfied with a release decision, the government may appeal. *See* 18 U.S.C. §§ 3141, 3142 & 3145. *See Goodwin,* 457 U.S. at 381, 384, 102 S.Ct. at 2494. Third, the prosecutor represents that the defendant was notified to anticipate a superseding indictment which would allege substantive counts (in furtherance of the conspiracies alleged) in the event the defendant did not change his plea. Plainly, this is an exercise of prosecutorial discretion which cannot support a presumptive inference of vindictiveness. *See Id.* at 380, 102 S.Ct. at 2492; *Bordenkircher,* 434 U.S. at 364–65, 98 S.Ct. at 668–69.

■■■■■ Nor does the lack of federal involvement from the outset of this case warrant a presumptive inference of vindictiveness. To the extent that the federal case is based upon different facts than the Oklahoma case, this weakens the prosecutorial vindictiveness claim. *Robison,* 644 F.2d at 1272–73. Moreover, it is unlikely that cooperation between state and federal law enforcement authorities results from any desire to punish a defendant for the exercise of procedural rights. Prosecutorial discretion to vindicate the societal interest in prosecution includes a decision to refer a case for prosecution in a more suitable forum. *Cf. Goodwin,* 457 U.S. at 382, 102 S.Ct. at 2493 ("A prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the societal interest in prosecution.") *See also Mills,* 925 F.2d at 463. Several reasons may favor a federal prosecution: (1) a substantial federal interest in the subject matter, (2) more appropriate federal penalties, (3) greater prosecutorial resources, and (4) efficiency concerns. *See Burt,* 619 F.2d at 838.

■■■ Finally, given the circumstances, we must reject the idea that the presence of the state prosecutor in the federal case warrants a presumptive inference of vindictiveness. Jeopardy never attached in the state prosecution and nothing in the record indicates that the state prosecution was barred. Even a cursory look at the indictment and superseding indictment in this case reveals marked differences between the federal prosecution and state prosecution including different offenses and defendants.

The district court's finding that a presumption of vindictiveness is not warranted is not error. We have considered the circumstances which the defendant claims create a presumption of vindictiveness; these circumstances do not create a reasonable likelihood of vindictiveness given the Supreme Court's decisions in the pretrial context. Because a presumption does not arise, we need not consider the district court's findings supporting a conclusion that the government had successfully rebutted any presumption. The district court properly declined to dismiss the superseding indictment based upon prosecutorial vindictiveness.

### III. Double Jeopardy–Cumulative Punishment

■■■ In addition to successive prosecutions, the double jeopardy clause of the fifth amendment also protects against cumulative punishment for the same offense. *Pearce,* 395 U.S. at 717, 89 S.Ct. at 2076. Given a claim of multiple punishments, the double jeopardy clause protects against a court prescribing more punishment than the legislature intended. *See Brown v. Ohio,* 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977). Traditional double jeopardy analysis provides "that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each requires proof of a fact which the other does not." *Blockburger v. United States,* 284 U.S. 299, 304,

52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). Although the *Blockburger* test recently has been supplemented in the double jeopardy subsequent prosecution context, *see Grady,* 110 S.Ct. at 2090, we believe it remains the test in the multiple punishment context.

The Supreme Court has had several occasions to apply the *Blockburger* test in the cumulative punishment context. *See Grady,* 110 S.Ct. at 2091 n. 8. For example, the Court determined that Sherman Act convictions for conspiracy in restraint of trade, 15 U.S.C. § 1, and conspiracy to monopolize, 15 U.S.C. § 2, do not amount to multiplicity of punishment. *American Tobacco Co. v. United States,* 328 U.S. 781, 787–88, 66 S.Ct. 1125, 1128–29, 90 L.Ed. 1575 (1946). Both sections of the Act "require proof of conspiracies which are reciprocally distinguishable from and independent of each other although the objects of the conspiracies may overlap." *Id.* at 788, 66 S.Ct. at 1129. Likewise, consecutive sentences may be imposed for a conspiracy to import marijuana, 21 U.S.C. § 963, and a conspiracy to distribute marijuana, 21 U.S.C. § 846; each conviction required proof of a fact the other did not. *Albernaz v. United States,* 450 U.S. 333, 334, 339, 101 S.Ct. 1137, 1140, 1142, 67 L.Ed.2d 275 (1981).

Judged against these standards, defendant's claim that the three conspiracies alleged in the indictment cannot be punished cumulatively is without merit. Count one involves conspiracy to misbrand drugs (MDMA), *see* 18 U.S.C. § 371, 21 U.S.C. §§ 331 & 333(a)(2); count two involves conspiracy to distribute MDMA, a controlled substance analogue, 21 U.S.C. §§ 813, 841(a)(1) & 846; and count three involves a conspiracy to possess with intent to distribute and distribute cocaine, 21 U.S.C. §§ 841(a)(1) & 846. The differences between the three conspiracies charged are manifest. All three conspiracies have different objects, from introducing misbranded MDMA into interstate commerce with the intent to defraud or mislead, to distributing MDMA, to distributing cocaine. *See Albernaz,* 450 U.S. at 339, 101 S.Ct. at 1142. Unlike the conspiracies in counts one and two, the conspiracy in count three involves a different drug, cocaine. Each conspiracy requires proof of different facts.

## IV. Sufficiency of the Evidence– Count Three

■ According to defendant, the evidence is insufficient on count three, conspiracy to possess with intent to distribute and distribution of cocaine, 18 U.S.C. §§ 841(a)(1), 846. We review the evidence and its reasonable inferences in the light most favorable to the government to "determine "whether any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

Defendant acknowledges that Kevin Volk testified concerning the consignment arrangement he had with defendant to sell cocaine. *See* Appellant's Brief at 27; rec. supp. vol. V at 481–84. Another drug dealer, Leslie Lynn Ricks testified concerning defendant's efforts to sell him cocaine. Rec. supp. vol. VI at 750–54. Finally, defendant confessed to purchasing quantities of cocaine from his MDMA supplier. *Id.* supp. vol. III at 77. Although defendant claimed that the cocaine was for his personal use, he also indicated that sometimes he sold to close personal friends. *Id.*

According to defendant, the evidence is insufficient because

> There is no evidence of any sale of cocaine outside the alleged conspiracy, and no evidence of any ability to distribute any significant quantity of the drug, and no evidence of any agreement to distribute cocaine between Raymer and Volk

Appellant's Brief at 28. On the first point, the only two parties named in count three were defendant and Jeffrey Wynn Casale (who was acquitted), yet Volk testified to distributing cocaine supplied by defendant to Cama Coats and Terry Frammel, among others. Moreover, for a sufficiency analysis, it makes no difference whether the defendant sold only to close friends. The federal drug laws do not admit a "close friend" exception. Concerning the second point, defendant distributed cocaine to Volk

and it must be remembered that defendant's picture, posing over a pound of suspected cocaine, was admitted into evidence. The evidence is sufficient to sustain the conviction on count three.

## V. Sufficiency of the Evidence–Counts One, Four, Five and Seven

██ Defendant argues that the evidence was insufficient to convict him of conspiracy to introduce and introducing misbranded MDMA into interstate commerce with intent to mislead or defraud natural persons or a government agency, specifically a local police department. We agree, but only in part. Codefendant Mitcheltree adopted defendant's brief on this point and we analyzed the sufficiency issues in her appeal, considering the facts in both cases. *See Mitcheltree*, 940 F.2d at 1345–1352. We held that although the evidence was sufficient to convict both defendants of introducing misbranded drugs into interstate commerce with an intent to mislead or defraud natural persons, it was insufficient on the government agency theory. *Id.* at 1346–1347, 1351–1352. We follow the same course in this case.

Because the MDMA misbranding counts (counts one, four, five and seven) were submitted to the jury "on a theory for which insufficient evidence exists and we cannot 'confidently determine that the jury relied on the theory validly supported by the evidence,' we must reverse the convictions" on those counts and also remand for a new trial. *Id.* at 1352 (quoting *United States v. Larranaga*, 787 F.2d 489, 498 (10th Cir.1986)). As in *Mitcheltree*, "we decline to order the district court to impose misdemeanor convictions on those counts." *Id.* at 1352 n. 17.

## VI. *Ex Post Facto* Clause and the Controlled Substance Analogue Enforcement Act–Counts Two and Eight

██ In *Mitcheltree*, we discussed the checkered history of scheduling MDMA as

a schedule I controlled substance. *Id.* at 1335–1336. MDMA did not become subject to federal controlled substance penalties until October 27, 1986. Pursuant to 21 U.S.C. § 811(h), the DEA first sought to schedule temporarily MDMA as a schedule I controlled substance. 50 Fed.Reg. 22,119 (1985). In *United States v. Spain*, 825 F.2d 1426 (10th Cir.1987), we held that this attempted temporary scheduling was invalid and that an order scheduling the drug had not been timely issued.[5] *Id.* at 1429. *See also United States v. Caudle*, 828 F.2d 1111, 1113 (5th Cir.1987) (holding MDMA temporary scheduling procedurally defective). A final rule placing MDMA in schedule I, effective November 13, 1986, 51 Fed. Reg. 36,552 (1986), was vacated for further agency consideration. *Grinspoon v. Drug Enforcement Adm'n*, 828 F.2d 881, 898 (1st Cir.1987). Thus, during the period when the scheduling was invalid on procedural grounds, MDMA was not a controlled substance. *United States v. Desurra*, 865 F.2d 651, 652–53, *reh'g denied*, 868 F.2d 716 (5th Cir.1989).

As a controlled substance *analogue*, MDMA was treated as a schedule I controlled substance as of October 27, 1986. The Controlled Substance Analogue Enforcement Act of 1986, Pub.L. 99–570, tit. I, subtit. E, § 1202, 100 Stat. 3207–13 to 3207–14 (Oct. 27, 1986), provided that a controlled substance analogue intended for human consumption would be treated as a schedule I controlled substance. 21 U.S.C. § 813. Effective March 23, 1988, however, MDMA was permanently scheduled in schedule I as a controlled substance. 53 Fed.Reg. 5,156 (1988).

However, as of October 27, 1986, MDMA, as a controlled substance analogue, was validly included in schedule I. 21 U.S.C. § 813 provides:

---

**5.** The Supreme Court subsequently determined that temporary scheduling by the Attorney General or the DEA was not invalid as an unlawful delegation. *United States v. Touby*, — U.S. —, —, 111 S.Ct. 1752, 1758, 114 L.Ed.2d 219 (1991). *Touby* overruled that portion of *United States v. Spain*, 825 F.2d 1426, 1427–29 (10th Cir.1987), to the contrary, and also overruled *United States v. Widdowson*, 916 F.2d 587 (10th Cir.1990). However, *Touby* does not alter the *Spain* court's conclusion that the initial temporary scheduling of MDMA was invalid on procedural grounds. *See Spain*, 825 F.2d at 1426; *Caudle*, 828 F.2d at 1112–13.

**1046**

*Treatment of controlled substance analogues*

A controlled substance analogue shall, to the extent intended for human consumption, be treated, for the purpose of this title and title III as a controlled substance in schedule I.

The Act further provides that a controlled substance analogue "does not include . . . a controlled substance." 21 U.S.C. § 802(32)(B)(i).

Defendant argues that MDMA could not be a controlled substance *analogue* during the times alleged in the superseding indictment because the government had attempted to schedule it as a regular controlled *substance.* Once the government tried to schedule MDMA as a controlled substance, defendant contends that it could not be a controlled substance analogue. According to the defendant, it makes no difference that MDMA was not validly scheduled as a controlled substance for two reasons. First, the definition of a controlled substance analogue may not include a controlled substance. Second, the definition of a controlled substance includes "a drug or other substance, or immediate precursor, included in Schedule I, II, III, IV or V of part B of this subchapter." 21 U.S.C. § 802(6); thus, because MDMA was included in Schedule I (albeit invalidly) it had to be a controlled substance and could not be a controlled substance analogue. Defendant argues that the above definition permits no inquiry as to whether a substance is properly included in schedule I; once scheduled, always scheduled. Persisting in this argument, defendant claims that any other interpretation would violate the *ex post facto* clause.

■ For a law to be *ex post facto*, "it must be retrospective, that is it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." *Weaver v. Graham,* 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981) (footnotes omitted). An *ex post facto* law is more severe than the prior law. *Miller v. Florida,* 482 U.S. 423, 431, 107 S.Ct. 2446, 2451, 96 L.Ed.2d 351 (1987). On the other hand, a procedural change in the law which does not alter substantial personal rights does not violate the *ex post facto* clause. *Id.* at 430, 107 S.Ct. at 2451.

Defendant's argument brings to mind an old saying: "Just because you're standing in a garage doesn't make you a car." Just because MDMA had been scheduled *as a controlled substance* did not mean that its scheduling could never be challenged and held invalid. In upholding the temporary scheduling provision from an unlawful delegation challenge, the Supreme Court noted that the restriction on judicial review under 21 U.S.C. § 811(h)(6) "does not preclude an individual facing criminal charges from bringing a challenge to a temporary scheduling order as a defense to prosecution." *United States v. Touby,* — U.S. —, —, 111 S.Ct. 1752, 1753, 114 L.Ed.2d 219 (1991). A successful challenge may have the effect of invalidating the scheduling. We are in complete agreement with the Fifth Circuit on this point: once the scheduling was held invalid procedurally, MDMA was not a controlled substance and quite correctly could be considered an analogue within the definition contained in 21 U.S.C. §§ 802(6) and 802(32). *Desurra,* 865 F.2d at 653.

Thus, defendant's *ex post facto* argument must be rejected. The addition of MDMA to schedule I as a controlled substance analogue was effective October 27, 1986. Defendant was prosecuted under the analogue statute for activities occurring subsequent to this time. Thus, the statute is not being applied retrospectively. Moreover, defendant's argument necessarily presumes that the faulty schedulings were effective; that being the case defendant would be unable to show prejudice arising from the inclusion of MDMA in schedule I pursuant to the analogue statute.

**AFFIRMED IN PART, REVERSED IN PART AND REMANDED.**